UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                                      No. 1:17-CR-45

vs.                                                           Hon. Paul L. Maloney
                                                                 United States District Judge

KEVIN JOHN GRIMM,

    Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

        Defendant Kevin Grimm is a 62-year-old electrical engineer with a Master's degree from Western Michigan University and a Bachelor of Science degree in electrical engineering from Michigan Technological University. He is a licensed Professional Engineer and electrician, and provides engineering consulting services for electrical and power companies. For more than five years, Defendant billed Herman Miller Incorporated ("HMI") for natural gas services that his company, KJ Gas Transportation LLC, never provided. Yet, with all of his education, training, and experience, Defendant would have this Court believe that he did not know that he was defrauding HMI until the end of the scheme, and did not even know what the word "fraud" meant in October 2015 when HMI representatives first confronted him about his fraudulent invoices.

        Defendant's statements to this Court are dangerously close to failing to accept responsibility for his role in the scheme. (R.28: PSR ¶58) He now claims that it was not until late 2013 — more than three years after the fraudulent billing scheme commenced — that he "started [to] seriously question[] the legitimacy of this business . . . ." (*Id.*, ¶58 at 15) Defendant contends that he merely saw "red flags," which he deliberately chose to ignore because the money was too good to further investigate and confirm that he was committing a massive fraud with Jerry Akers.

Defendant also would have this Court believe that his ongoing "suspicion" that he was actually not ordering or transporting gas for HMI was finally "confirmed" by Akers on November 19, 2015, well after HMI had terminated its relationship with him.  (*Id.*, ¶58 at 16)

The government is not buying what Defendant is selling.

Defendant knew that he was participating in a scheme to defraud HMI with Akers long before the scheme ended.  The basic facts demonstrate that Defendant knew almost immediately that, despite whatever legitimate business plan he may have discussed with Akers, the fraud started with the first fake invoice in 2010:

- Defendant's company existed solely on paper.  Defendant had absolutely no training, experience, or ability to provide HMI with any natural gas ordering or transportation services whatsoever, from the inception of the scheme in 2010 until its completion in 2015.

- Defendant did nothing for the money he took from HMI, and therefore knew he had no gas-related expenses.  The income he was receiving from HMI was pure profit.

- Defendant had no gas transportation trucks or pipelines; no employees; and no physical presence.  He operated the business on a computer at his personal residence.

- The only time Defendant spent working on HMI matters (other than managing the money he stole from HMI) was creating the fake invoices and e-mailing them to HMI each month using information supplied to him by Akers.  When the FBI executed a search warrant at his home and interviewed him, Defendant admitted that he "was paid over $1 million dollars for not doing anything."

2

- Month after month, Defendant simply opened an e-mail from Akers containing gas delivery numbers, converted the information into a KJ Gas Transportation invoice, and e-mailed the invoice to HMI with the message: "Thanks for the work!" (Exhibit 1: Mar. 2, 2015 e-mail to HMI attaching invoice)

- Defendant even pocketed about $100,000 in "sales tax" he charged HMI instead of paying those monies to the State of Michigan like a real business.

- When HMI representatives first inquired about his business and invoices, Defendant would not discuss his business with them. When one of the investigators used the word "fraud," Defendant asked them to leave his property.

(R.28: PSR ¶¶24, 27, 29, 37)

Defendant appears to invoke the legal doctrine of "deliberate ignorance" to attempt to minimize his role in the offense. Defendant does not dispute that he is legally responsible for his actions, but wants this Court to believe that he deliberately ignored the high probability that he was executing a scheme to defraud HMI of money and closed his eyes to what was obvious. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011) (willful blindness is "well-established in criminal law" because defendants cannot "deliberately shield[] themselves from clear evidence of critical facts that are strongly suggested by the circumstances."); *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012) (deliberate ignorance jury instruction, also known as the "ostrich" instruction, is appropriate when defendant claims a lack of guilty knowledge and the evidence support an inference of deliberate ignorance).

This Court should not believe that Jerry Akers was a criminal mastermind who initially tricked Defendant into participating in the fraud. Defendant is not the gullible fool he attempts to portray. He is highly educated and trained. (R.28: PSR ¶¶98-100) He conceived of and operated

a successful *real* energy consulting business, Power Systems Solutions, that performed *real* consulting work. (*Id.*, ¶104) Before that, he was employed as a senior sales engineer, including at General Electric. (*Id.*, ¶¶105-106) Defendant knows how legitimate businesses operate and knew that a gas transportation company working for a large manufacturer like HMI could not generate $1.77 million in revenues with no cost of goods sold or other direct operating expenses. It defies logic and common sense that a successful businessman like Defendant would believe that he could run a natural gas ordering and distribution business with no employees, infrastructure, or service-related expenses.

Second, when Akers was confronted by HMI about the KJ Gas contract, Akers admitted that it was a scam and told investigators that Defendant also knew that the KJ Gas invoices were fraudulent: "Both Kevin Grimm and I knew that the billing and the subsequent payments from HMI were fraudulent." (*Id.*, ¶28 at 8) Although the government does not dispute that Akers and Defendant may have initially discussed forming a legitimate business to provide real services to HMI, any legitimacy in the venture disappeared when Grimm started billing HMI for services he never performed, knew nothing about, and incurred no expenses to provide.

Third, Defendant's claim that he does not fully understand the meaning of the word "fraud" is a phony attempt to explain why he asked HMI investigators to leave his property when he was first confronted about the KJ Gas invoices. (*Id.*, ¶58 at 16) Not only is such an assertion implausible on its face given Defendant's education and experience, the government found evidence that Defendant fully understood and even used the word "fraud" in his personal life. When a civil lawsuit was filed against him in 2014 by American Express Bank for failing to pay a credit card charge, Defendant sought to dismiss the lawsuit by alleging that he was defrauded by the business. Defendant wrote a letter stating that he was not responsible for a credit card charge

4

because the charge involved a "fraudulent company" and that the contract resulting in the charge "was signed under false pretenses . . . ." (Exhibit 2: Dec. 4, 2014 letter re summons)  Defendant demonstrated that he fully understood what "fraud" meant when he sought to avoid paying for a service he claimed was never actually provided to him.

Fourth, Defendant's actions immediately after he asked HMI representatives to leave his property provide insight into what Defendant knew before they knocked on his door.  On October 29, 2015, the very next day, Defendant created and executed a "QuitClaim Deed" he found on the Internet, which purports to transfer all of his legal interest in his real property to his wife. (Exhibit 3: Quitclaim Deed)  Defendant hurriedly sought to protect his assets from HMI and law enforcement when they inevitably would seek the return of the stolen money.  This is not one of the first steps an individual who honestly believed he was running a legitimate company would take when first questioned about his business dealings by his only customer.

Fifth, shortly after he knew HMI was investigating the fraud, Defendant took steps to minimize the evidence of his guilty knowledge.  On November 18, 2015, Defendant sent Akers a text message that read: "No phone or email or text communication." (Exhibit 4:  Photo of Grimm Text Message to Akers)  When Akers met with Defendant in person the next day, Defendant said: "I should ask you if you're wearing a wire," and further indicated that Akers should prove to him that he was not wearing a wire.  Defendant also told Akers that, "I'm sure they don't have wires and taps on the boat," but that he and his wife were hardly talking in his house and warned Akers that "your house could be wired."[1]

Those are not the actions and statements of a legitimate businessman who got caught up in someone else's fraudulent scheme and deliberately avoided confirming that his invoices were a

---

[1] The full audio recording of the conversation was produced to Defendant in discovery and will be made available to the Court at sentencing, if necessary.

total sham.  They reflect the guilty mind of a criminal who obtained and deposited 62 HMI checks totaling $1,772,726.14 "for not doing anything," and attempted to minimize the damage and consequences.

The government acknowledges that Defendant has returned a substantial sum of stolen money that was still in his possession when law enforcement discovered the fraud, liquidated tangible assets that he purchased using stolen money, and made other efforts to repay the money he stole.  Indeed, the return of over $1 million of stolen money to a victim is extraordinary.  Nevertheless, criminal defendants cannot buy their way out of prison by returning what they stole after their fraud has been discovered.  Defendant returned the money to HMI's insurer because it was the right thing to do, because he had saved much of the net proceeds for his retirement (unlike most defendants who no longer have the money), and because he knew the government was preparing to seize and forfeit any remaining assets that could be traced to the fraud.  While Defendant's pre-sentencing restitution payments are to be commended, returning stolen money to the victim should not be rewarded by this Court in the form of a downward variance.

Finally, a downward variance is not appropriate in a case where Defendant dragged his feet and waited until June 2016 to finally proffer information to the government – long after he knew the fraud was discovered and the FBI executed a search warrant at his residence in December 2015.  Additionally, the government believes that Defendant was not fully truthful during his proffer interview with the FBI, including when he claimed not to know the meaning of the word "fraud."  (R.28: PSR ¶45)  By comparison, co-conspirator Akers immediately reached out to law enforcement in November 2015 to begin cooperating with the investigation, negotiated a pre-indictment resolution, and earned a substantial assistance departure.  In this case, the government expended considerable additional effort to continue its investigation of Defendant's role and trace

all of the fraudulent proceeds before presenting the matter to the Grand Jury for indictment. Defendant's reluctance to come forward stands in stark contrast to his co-conspirator's early acceptance of responsibility.

## Conclusion

The government respectfully recommends a sentence of imprisonment within the advisory Sentencing Guideline range of 33 to 41 months. On this record, Defendant cannot demonstrate that a downward variance from the Sentencing Guidelines is appropriate in light of his failure to honestly admit to this Court that he knew that he was committing a fraud against HMI long before the scheme was discovered.

                Respectfully submitted,

                ANDREW BYERLY BIRGE
                Acting United States Attorney

Dated:  July 3, 2017               /s/ *Christopher M. O'Connor*
                CHRISTOPHER M. O'CONNOR
                Assistant United States Attorney
                United States Attorney's Office
                P.O. Box 208
                Grand Rapids, Michigan 49501-0208
                (616) 456-2404